UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CEQUITA A. HAGOOD | ) | CASE NO. 1:12CV2063 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Cequita A. Hagood Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his April 15, 2011 decision in finding that Plaintiff was not disabled because Plaintiff is capable of medium work, but with some additional limitations due to her psychological and physical limitations (Tr. 25-26). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.    PROCEDURAL HISTORY**

Plaintiff filed for DIB on February 6, 2009, based on allegations that she experienced bipolar disorder, high blood pressure, hypothyroidism, osteoarthritis of the knees, insomnia, and problems understanding simple instructions (Tr. 69, 142). Thereafter, Plaintiff filed for SSI benefits on

1

February 13, 2009 (Tr. 70).  Plaintiff alleges that her conditions became disabling, rendering her incapable of work as of May 2, 2008 (Tr. 127, 129).

The Commissioner denied Plaintiff's claims initially on July 1, 2009 (Tr. 69-70), and upon reconsideration on November 3, 2009 (Tr. 71-72).  Thereafter, Plaintiff appealed for a hearing before an ALJ (Tr. 91).  At the hearing, Plaintiff, who was represented by legal counsel, and vocational expert (VE) Kathleen Reis also testified (Tr. 37, 61).  On April 15, 2011, the ALJ issued a decision, finding Plaintiff not disabled under the Act (Tr. 20-30).  Following the ALJ's ruling, Plaintiff filed a request for review to the Appeals Council, which was denied on July 2, 2012 (Tr. 1-3).  Thereafter, Plaintiff filed this action for judicial review pursuant to 42 U.S.C. Sections 405(g) and 1383©.
.

## II. STATEMENT OF FACTS

Plaintiff was forty-seven years at the time of the ALJ's decision in this matter, a "younger individual" under the Social Security Regulations (Tr. 127, 129); 20 C.F.R. Sections 404.1563©, 416.963(c).  She completed high school and attended one year of college (Tr. 146).  Plaintiff can speak, understand, read, and write English (Tr. 141).  Prior to that date on which her alleged disability began, Plaintiff worked as a home health care aide (Tr. 46).

## III. SUMMARY OF MEDICAL EVIDENCE

On August 11, 2008, Plaintiff began receiving health care at Metro Broadway Health Center (Metro), where she was treated by Felicia C. Hameed, a licensed social worker, Dr. Gannon, who managed her prescriptions and conducted mental status exams, and Kenneth Frisof, M.D., who treated her physical complaints (Tr. 200, 215, 222).  On August 11, 2008, Plaintiff complained to Dr. Frisof

that she was experiencing leg pain, had trouble using stairs, had trouble falling and staying asleep, and had neck spasms (Tr. 222-23). Upon examination, Dr. Frisof found that Plaintiff had a full range of motion in her neck, her knees had no unusual warmth, effusion (fluid-based swelling), or edema (swelling), but that she did have some mild degenerative joint disorder (Tr. 223).

On August 28, 2008, Plaintiff complained to Ms. Hameed that she was in a "slump all the time," and had been depressed for twenty years, despite the fact that she was employed for much of that time (Tr. 215-16). Although this appointment took place after Plaintiff's alleged disability onset date, she reported to Ms. Hameed that she was waiting to take a nursing assistant test so that she could return to work (Tr. 218). Plaintiff also reported experiencing depression, anxiety, agitation, an increase in isolation, poor sleep, mood swings, irritability around others, and poor memory and concentration, although she exhibited a normal mental status exam and had no physical pain (Tr. 216, 219). Ms. Hameed found that Plaintiff appeared well groomed; she was cooperative and fully oriented; her speech was normal; her thought processes were logical and organized; she had no abnormal or psychotic thoughts; her judgment and insight were good; her recent and remote memory were within normal limits; her attention span and concentration were sustained; her mood was normal; and her affect displayed a full range (Tr. 219). Ms. Hameed diagnosed Plaintiff with depressive disorder, and assigned her a Global Assessment of Functioning (GAF) score of 61-70 (Tr. 220). At the time of the exam, Plaintiff was divorced, following a fourteen-year marriage, and was in a six-month relationship (Tr. 218).

On August 29, 2008, Plaintiff saw Dr. Frisof, at which time she reported feeling much better, with better sleep, and no daytime drowsiness (Tr. 214). Plaintiff told Dr. Frisof that she wanted to have another child with her current partner (Tr. 214). Dr. Frisof noted that Plaintiff smiled broadly throughout the visit, and testing revealed that she had benign hypertension, was doing well on her

3

insomnia medication, such that no additional work up was necessary, and she had only a borderline hypothyroid condition (Tr. 214).

Plaintiff returned to Dr. Frisof again on February 5, 2009 (Tr. 212). At that time she reported pain in her right knee, which she blamed on a fall down the stairs during summer 2008 (Tr. 212). Dr. Frisof noted in his report that Plaintiff had never mentioned such a fall during her August 2008 visit with him, and she had not had any x-rays of her knee during that time frame (Tr. 212). Upon examination, Dr. Frisof noted that both of Plaintiff's knees had "excessive patellar mobility," but found that Plaintiff's right knee had no unusual warmth or effusion, no crepitus (popping), and her right knee ligaments were intact (Tr. 212). Plaintiff also reported that her insomnia had worsened (Tr. 212). As a result, Dr. Frisof increased Plaintiff's insomnia medication (Tr. 212).

On February 6, 2009, Plaintiff visited Ms. Hameed (Tr. 209). Plaintiff reported that her niece had recently been shot, and the ensuing stress caused her to overdose on pills (Tr. 209). Plaintiff reported that the pills just made her sleep, and she did not visit the emergency room (Tr. 209). Accordingly, there were no medical records available to substantiate her claims. Plaintiff also complained that her insomnia had worsened, and she was only sleeping three to four hours per night (Tr. 209). Despite these subjective complaints, Plaintiff's mental status exam was normal, and her results were the same as reported by Ms. Hameed in August 2008 (Tr. 210).

Plaintiff visited Ms. Hameed on February 12, 2009, at which time she reported that her medication was helping her sleep (Tr. 207). Plaintiff also reported that she was in no physical pain (Tr. 207). As before, her mental status exam was consistently normal (Tr. 207). Plaintiff visited Ms. Hameed on March 6, 2009 (Tr. 202), and Plaintiff's mental status exam results were normal and consistent, despite some additional stressors related to Plaintiff's housing situation (Tr. 203-04). Although she testified to the ALJ that she had not drunk alcohol since 2000, Plaintiff reported to Ms.

Hameed that she was drinking wine every other day, and was decreasing the amount of marijuana she used (Tr. 57, 202). In addition, Plaintiff told Ms. Hameed that she was currently applying for disability benefits, that she had no idea what she applying for, but that she "needs a break, and she feels they could give her money since she has worked every year up until this last year" (Tr. 203). Plaintiff also informed Ms. Hameed that she was looking for employment – almost one year after the date she claimed to be unable to work (Tr. 203).

On March 26, 2009, Plaintiff was seen by both Ms. Hameed and Dr. Gannon (Tr. 198, 200). Plaintiff reported to Dr. Gannon that her medication was keeping her from losing control of her depression symptoms (Tr. 200). Although Plaintiff's mood appeared depressed and her affect was flat, her mental status exam was otherwise normal (Tr. 201). Dr. Gannon noted that Plaintiff's condition was stable (Tr. 200). Plaintiff reported to Ms. Hameed that she felt taken advantage of in her current living situation, because she was expected to do all household cleaning and chores (Tr. 198). Plaintiff had normal results in her mental status exam, and Ms. Hameed wrote that Plaintiff was stabilizing (Tr. 199).

On April 16, 2009 and May 6, 2009, Plaintiff visited Ms. Hameed, and her mental status exams were normal (Tr. 191-92, 197). Plaintiff reported feeling calmer, that her sleep and appetite were good, and that her medication was working (Tr. 196). Plaintiff also reported her mood was stable on medication, she was keeping busy by caring for her children, and that her mood was rated as a seven out of ten (ten being the most positive number) (Tr. 191). In addition, on May 6, 2009, Plaintiff saw Dr. Gannon, and confirmed that she was doing better, her medication was working, and her condition was stable (Tr. 193-94).

On June 16, 2009, Kristen Haskins, Psy.D., conducted a Psychiatric Review Technique form to assess Plaintiff's mental impairments (Tr. 239). Dr. Haskins wrote that Plaintiff's depressive

5

disorder was not severe (Tr. 239, 242). Dr. Haskins found that Plaintiff had no restrictions in her activities of daily living; only mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation (Tr. 239). Dr. Haskins noted that Plaintiff's mental status exam results were all normal; she reports anxiety in crowds, but her medications help; she copes with her occasional memory problems by writing things down; she is able to cook for herself, do household chores, take the bus, and is compliant with her treatment; and she can understand, remember, and complete tasks (Tr. 251). Thereafter, on June 17, 2009, Plaintiff reported to Ms. Hameed that she was doing well (Tr. 263). Plaintiff reported she was stable on her medication, she was engaging in more outdoor activities, and she was not in physical pain (Tr. 263). Furthermore, her mental status exam results were normal (Tr. 263-64).

On July 1, 2009, William Botz, M.D. completed a medical evaluation, and determined that Plaintiff had "no medically determinable severe physical impairment."

On August 4, 2009, Plaintiff reported to Dr. Gannon that she signed up for school, and was taking classes to become a nurse (Tr. 256). Plaintiff rated her mood as a seven out of ten, she was stable on her medication, and her mental status exam results were normal (Tr. 256-57). However, Dr. Gannon completed a medical source statement on September 4, 2009 that reflected that Plaintiff was incapable of gainful employment due to her psychiatric problems (Tr. 309). Although Plaintiff had always scored normally and consistently on her mental status exams, and had demonstrated her improvement when medicated, Dr. Gannon wrote that Plaintiff scored poorly in her ability to perform numerous work-related functions, such as using good judgment and consistently attending work (Tr. 308-09). Nevertheless, Dr. Gannon noted that Plaintiff's mental status exam results were normal, including her judgment and insight, her memory, her attention span and concentration, and her mood

6

(Tr. 289).  Further, on that date, Plaintiff reported she was doing "OK," provided she takes her medication (Tr. 289).  Dr. Gannon also noted that she was stable (Tr. 290).  On September 19, 2009, Karen Terry, Ph.D. affirmed the June 16, 2009 findings of Dr. Haskins, in which she wrote that Plaintiff's depressive disorder was not severe (Tr. 310).

On October 1, 2009, Dr. Frisof wrote that Plaintiff was doing well physically, although she reported having occasional, severe knee pain (Tr. 347).  Upon examination, Plaintiff's knees showed no unusual warmth or effusion, and her legs did not exhibit edema (Tr. 347).  Plaintiff also asked Dr. Frisof to fill out disability forms for her, but Dr. Frisof explained to her that her alleged disability likely related more to her mental state rather than her physical symptoms (Tr. 347).  Plaintiff understood and agreed with Dr. Frisof's assessment that her physical symptoms were not the cause of her perceived disability (Tr. 347).  Diane Manos, M.D. also agreed with Dr. Frisof, when she conducted a medical evaluation of Plaintiff and found that "[t]here continues to be no medically determinable severe physical impairment" (Tr. 311).

During visits with Ms. Hameed and Dr. Gannon from October 2009 through June 2010, Plaintiff's mental status exam results, as well as her symptoms, remained relatively consistent (Tr. 314, 316-18, 320, 322-29, 351).  Plaintiff reported her mood as a nine out of ten in December 2009 (Tr. 326).  Furthermore, in December 2009, Ms. Hameed wrote that Plaintiff's symptoms were in partial remission (Tr. 327).

With respect to Plaintiff's knees, images taken on May 14, 2010 showed no joint effusion, fracture, or dislocation (Tr. 363).  Plaintiff's joint spaces were well preserved, her soft tissues were normal, and there was no abnormality observed (Tr. 363).  On May 17, 2010, Dr. Frisof examined Plaintiff, and found that, although Plaintiff complained of pain in her knees, her knees showed no unusual warmth or effusion, her legs had no edema, but she did have moderate crepitus in her right

7

knee (Tr. 358). Plaintiff also complained of muscle spasms in her back and of experiencing neck pain (Tr. 358). Upon examination, Plaintiff's cervical spine had a reduced range of motion, but there was no evidence of acute pain or spasm (Tr. 358). Plaintiff did have spasms in her left paraspinal at level L2, as well as a knot in her muscle (Tr. 358). Dr. Frisof treated Plaintiff with some anti-spasm medication, and he recommended that she use heat and ice on her back as needed (Tr. 359).

Finally, in October 2011, Plaintiff received treatment at the Cleveland Clinic Foundation with Soumya Chatterjee, M.D. (Tr. 367, 373). Dr. Chatterjee noted that Plaintiff occasionally drank alcohol (Tr. 375). Upon physical examination, Dr. Chatterjee noted that Plaintiff was well appearing, not in acute distress, and had a supple neck (Tr. 368). Plaintiff's spine had a normal range of motion, her muscular strength was intact, and, although she had a painful range of motion in her knees, her knees had no effusion or instability (Tr. 368). Dr. Chatterjee treated Plaintiff's knee with a steroid injection (Tr. 370).

## IV.   **SUMMARY OF TESTIMONY**

Plaintiff testified at the hearing that she lives with her children, ages fifteen and seven (Tr. 44). Plaintiff has no problem dressing or bathing herself, and she does not need reminders to maintain her hygiene (Tr. 54, 153). She testified that she does not nap during the day; however, she wrote in her function report that she takes several naps throughout the day (Tr. 53, 152). She also testified that she only occasionally cooks, and that her sister helps make her meals about four days a week; however, she wrote in her function report that she prepares her own meals daily (Tr. 153). Furthermore, Plaintiff reports that she vacuums and dusts every day, and she does not need help or encouragement to complete those tasks (Tr. 154). Plaintiff travels on public transportation, goes out alone, and shops for food about once a month (Tr. 154). Plaintiff can pay bills, count change, handle a savings account,

and use a checkbook (Tr. 155). She visits her sister about once per week, and she needs no reminders to go places (Tr. 155). Plaintiff has no problem getting along with family, friends, neighbors, or authority figures (Tr. 155-56).

Thereafter, the VE testified that Plaintiff has past work experience as a nurse's aide, which is semiskilled (with no transferable skills for direct entry into other work), and classified as "medium," although she performed it at a "very heavy" level (Tr. 62). In response to a hypothetical question, assuming an individual of the same age, education, and work experience as Plaintiff, with no exertional limitations but limitations to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements, the VE responded that the individual could not perform Plaintiff's past work as it is actually or generally performed (Tr. 63). The individual could, however, perform work as an industrial cleaner, a car washer, and a grocery bagger (Tr. 63-64). A second hypothetical assumed the same individual with the following:

> ...limited to medium work (lift no more than fifty pounds occasionally, lift/carry up to twenty-five pounds frequently, stand/walk about six hours, and sit for up to six hours in an eight-hour workday with normal breaks) with occasional use of foot controls with the right lower extremity; could never climb ladders, ropes, or scaffolds; avoid all exposure to unprotected heights; nonexertionally, the work would be limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple, work-related decisions and routine workplace changes; could only be occasional superficial interaction with the public and coworkers (Tr. 64-65).

The VE testified that the individual could still perform the jobs of car washer and industrial cleaner, and added the position of kitchen helper in place of grocery bagger (which would involve more than occasional contact with the public) (Tr. 65). If the individual would be off task up to twenty percent of the day in additional to regularly-scheduled breaks, the VE stated that the individual would not be able to sustain work to retain a job (Tr. 66). Finally, if the individual, due to doctor

9

visits, symptoms, and side effects, would miss up to two workdays per month, the individual would not be able to keep a job without accommodation (Tr. 67).

### V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. 404.1520(c) and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII. ANALYSIS

Plaintiff asserts two assignments of error:

A. Whether the Administrative Law Judge erred in his evaluation of opinion evidence in the record.

B. Whether substantial evidence supports the Administrative Law Judge's residual functional capacity finding.

11

Plaintiff's treating physician, Angela Gannon, M.D.'s treatment notes, as well as the notes from a social worker and other reviewing doctors that contradicted Dr. Gannon's disability opinion, were given proper credit by the ALJ. On the day that Dr. Gannon wrote the medical source statement opinion that Plaintiff was incapable of sustained work, her treatment notes described Plaintiff's normal mental status exam and stable condition while on appropriate medication.

In addition, the ALJ explained the basis for determining Plaintiff's residual functional capacity (RFC) to perform medium work with certain exertional and non-exertional limitations relying on Plaintiff's purported limitations. The objective medical evidence, opinion evidence, and Plaintiff's reports, support the conclusion that Plaintiff is capable of medium work, and that the ALJ accommodated her medically-determinable symptoms by providing additional limitations within the medium work spectrum.

Based upon substantial evidence, the ALJ correctly determined that Plaintiff had the RFC to perform medium work, but with some additional limitations, due to her psychological and physical impairments (Tr. 25-26). The ALJ limited Plaintiff to performing medium jobs involving only occasional operation of a foot control with her right lower extremity; she cannot climb ladders, ropes, or scaffolds; she must avoid all exposure to unprotected heights; she can perform work that is limited to simple, routine, and repetitive tasks, in a work environment that is free of fast-paced production requirements and involves only simple work-related decision and routine workplace changes; she can have only occasional and superficial interaction with the public; and she can be around coworkers throughout the day, but can only have occasional and superficial interaction with them (Tr. 25-26). The ALJ also considered Plaintiff's subjective complaints, as well as the objective medical findings of record.

The ALJ is to consider the five-step sequential evaluation process for the adjudication of disability claims. 20 C.F.R. Sections 404.1520, 416.920. If an individual is found disabled at any step, further evaluation is unnecessary. *Id.* This sequential evaluation process requires the Commissioner to consider, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and (5) if not, whether she can perform other work in the national economy. *Id.*

In this case, the ALJ found that Plaintiff had severe impairments, including depression and osteoarthritis of the knees, but that such impairments did not prevent her from being able to perform work in the national economy (Tr. 22, 29-30). Thus, the ALJ correctly analyzed the medical opinion evidence, in determining Plaintiff's RFC.

Plaintiff first argues that the ALJ erred in his analysis of her treating physician when he afforded "less weight" to Dr. Gannon's opinion because he found that the limitations set forth in the doctor's medical source statement contradicted her treatment notes (Pl.'s Br. at 10). However, the ALJ noted that Dr. Gannon's medical source statement opinion directly contradicted her positive treatment notes regarding Plaintiff's mental condition, including her notes form the very same day she filled out the source statement (Tr. 27, 309). The ALJ adequately explained his assignment of less weight to Dr. Gannon's opinion.

The ALJ is assigned the responsibility of making the RFC and disability determinations. 20 C.F.R. Sections 404.1527(d)(1)-(2), 416.927(d)(1)-(2). While an ALJ will consider all relevant medical evidence, a "statement by a medical source that [the plaintiff] is 'disabled' or 'unable to work' does not mean that" the plaintiff is entitled to a finding of disability under the Act. 20 C.F.R. Sections 404.1527(d)(1), 416.927(d)(1).

The weight afforded to any medical opinion is dependent on the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. Sections 404.1527(c)(3)-(4), 416.927(c0(3)-(4). A treating physician's opinion is not given controlling weight under the regulations unless it is well supported by clinical findings and consistent with other substantial evidence. 20 C.F.R. Sections 404.1527(c)(2), 416.927(c)(2). When a treating physician's opinion is not given controlling weight, the ALJ will determine what weight to assign the opinion by analyzing factors, such as the opinion's supportability and its consistency with the entire record. 20 C.F.R. Sections 404.1527(c)(2), 416.927(c)(2); *Allen v. Comm'r of Soc. Sec.,* 561 3d 646, 651 (6th Cir. 2009).

In this case, Dr. Gannon recorded in her treatment notes that throughout her treatment of Plaintiff, from March 2009 to May 2010, Plaintiff's mental status exams revealed that she appeared well groomed; she was cooperative and fully oriented; her speech was normal; her thought processes were logical and organized; she had no abnormal or psychotic thoughts; her judgment and insight were good or fair; her recent and remote memory were within normal limits; and her attention span and concentration were sustained (Tr. 193, 201, 261, 289, 318, 320, 324). On the same day that Dr. Gannon wrote that Plaintiff was incapable of gainful employment due to her psychiatric problems (Tr. 309), Dr. Gannon also recorded in her treatment notes that Plaintiff's mental status exam results were normal, and that Plaintiff reported she was doing "OK," provided she takes her medication (Tr. 27, 289). Further, Ms. Hameed examined Plaintiff, and determined that she always had normal mental status exams (Tr. 191-92, 197, 203-04, 208, 210, 219, 256-57, 263-64, 316, 323, 327, 329, 351-52).

The ALJ also indicated that Dr. Gannon consistently reported that Plaintiff's condition was stable or stabilizing (Tr. 27, 194, 201, 261, 290, 318, 321, 325). Plaintiff argues that a "stable" condition is not the same as an improving or good condition (Pl.s Br. at 11). However, the ALJ correctly noted that Plaintiff's normal mental status and positive self-assessments were unchanged

14

throughout the course of her treatment relationship with Dr. Gannon (Tr. 27). Hence, Plaintiff's stable, normal condition throughout her treatment contradicts Dr. Gannon's medical source statement, in which she opined that Plaintiff could not engage in gainful employment (Tr. 309). Therefore, the ALJ's assignment of less weight to Dr. Gannon's medical source statement is supported by substantial evidence.

Plaintiff next argues that the ALJ did not adequately explain the basis for his RFC determination (Pl.'s Br. at 13-15). The ALJ set forth the evidence of record, as well as the evidentiary weight he assigned to such evidence, which supported his RFC determination.

An individual's RFC determination is the most she can do despite her impairments. 20 C.F.R. Sections 404.1545, 416.945; Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (S.S.A. 1996). The ALJ determines a claimant's RFC based on a review of the entire record, including the objective medical evidence, opinion evidence, and the claimant's testimony. 20 C.F.R. Sections 404.1545(a), 416.945(a). The ALJ's credibility determinations in regard to claimant's testimony are to be given great weight and deference by a reviewing court. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007), particularly since the ALJ has the opportunity of observing a witness' demeanor while testifying. *Cruse v. Comm'r of Soc. Sec.,* 502F.3d 532, 542 (6th Cir. 2007).

In regard to Plaintiff's physical impairments, the ALJ determined that Plaintiff could perform medium work, but that she could only perform medium exertion jobs involving occasional operation of a foot control with her right lower extremity; no climbing of ladders, ropes, or scaffolds; and she must avoid all exposure to unprotected heights (Tr. 25-26). Dr. Frisof recorded in his opinion that Plaintiff had right knee pain, but her left knee was fine (Tr. 26-27, 211-12). During that exam, Dr. Frisof noted that, although Plaintiff's knees had excessive patellar mobility, Plaintiff's right knee ligaments were intact, her legs showed no signs of edema, and her knees had no unusual warmth or effusion (Tr. 212). Dr. Frisof never linked Plaintiff's patellar mobility to any work or other limitation.

15

The ALJ also discussed a subsequent visit with Dr. Frisof, in which Plaintiff reported knee pain, but she again exhibited no signs of edema, no unusual warmth or effusion, and only moderate crepitus in her right knee (Tr. 27, 358). Plaintiff also testified at the hearing that she only had pain in her right knee (Tr. 27, 61). Further, Dr. Frisof explained to Plaintiff that her physical symptoms were not the source of her alleged disability, and Plaintiff agreed with the assessment (Tr. 347).

Plaintiff acknowledges the above findings as consistent with the medical evidence, nevertheless, she argues that the ALJ did not explain why Plaintiff meets the medium exertion requirement of standing and/or walking for approximately six hours in an eight-hour day (Pl.'s Br. at 15). However, there is no objective medical evidence in the record that indicates Plaintiff is incapable of such a requirement. The only evidence Plaintiff points to is her own testimony that she "has difficulty walking more than five or ten minutes at a time and going down stairs due to knee pain" (Pl.'s Br. at 14). Nothing in the medical record supports such a claim. In addition, based on the numerous inconsistencies between Plaintiff's testimony and her objective medical records, the ALJ determined that Plaintiff's complaints with respect to the intensity, persistence, and limiting effects of her symptoms were not credible (Tr. 27). Hence, there is no credible evidence that Plaintiff cannot stand and/or walk for six hours in an eight-hour workday.

Finally, Plaintiff argues that the ALJ failed to explain properly the non-exertional limitations with the RFC (Pl.'s Br. at 15). Plaintiff claims that because the ALJ "dismissed what little opinion evidence there was in the record, it is difficult to discern the basis for" the RFC finding (Pl.'s Br. at 15).

However, the ALJ did not dismiss the opinion evidence with respect to Plaintiff's non-exertional impairments. The ALJ accepted the consistent reports from Dr. Gannon and Ms. Hameed, but assigned less than controlling weight to Dr. Gannon's inconsistent medical source opinion (Tr. 27). Also, the ALJ acknowledged the mental functioning assessments by Dr. Haskins and Dr. Terry,

16

wherein both agreed that Plaintiff had no severe mental impairments (Tr. 28, 239, 310). The ALJ gave those assessments less weight, when compared with Plaintiff's treatment records from Dr. Gannon. Thus, the ALJ determined that Plaintiff did have some mental impairments, even though they were not disabling (Tr. 28). Therefore, the ALJ had sufficient source offering opinions on Plaintiff's mental condition. Based upon substantial evidence, the ALJ correctly credited the consistent sources, and accorded less weight to the uncorroborated sources.

## **VIII. CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform medium work, but with some additional limitations, due to her psychological and physical limitations.

Dated: March 26, 2013  */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE